GODFREY L. CABOT, INC., RESPONDENT, *v.* GAS ,PRODUCTS CO., DEFENDANT; DOUSMAN, TRUSTEE IN BANKRUPTCY, APPELLANT.

(No. 6,987.)

(Submitted January 28, 1933. Decided March 2, 1933.)

[19 Pac. (2d) 878.]

*Messrs. Farr & Farr* and *Mr. Charles J. Dousman,* for Appellant, submitted an original and a reply brief; *Mr. George W. Farr* argued the cause orally.

*Messrs. Loud & Choate,* for Respondent, submitted a brief; *Mr. I. W. Choate* argued the cause orally.

MR. JUSTICE ANGSTMAN delivered the opinion of the court.

This action was brought to recover the principal sum of $105,000, with interest, and to foreclose two mortgages and an assignment of leases given as security.

The complaint, which was filed January 29, 1930, is in the usual form. In substance it shows that plaintiff is a Massachusetts corporation with its principal place of business in Boston, and is engaged in producing natural gas and manufacturing carbon black, and acts as selling agent for other producers of carbon black. Defendant, at the time of the transactions involved here, was a South Dakota corporation

doing business in Montana. It manufactured carbon black at Baker, in Fallon county, Montana.

The two mortgages, one a real estate and the other a chattel mortgage, and the assignment of leases, are alleged to have been executed on September 5, 1928, by defendant company, covering an existing indebtedness of $60,000, and additional advancements not exceeding $40,000. At the same time there was executed a promissory note in the sum of $60,000, payable September 15, 1933. The real estate mortgage contained this clause: "The foregoing mortgage shall also stand as and be security for such further payments and additional sums of money, not exceeding, however, in the aggregate forty thousand (40,000) dollars, as may from time to time hereafter, during the life of this instrument, be advanced and loaned by the said mortgagee to said mortgagor, together with the interest thereon, which said further advances when made shall be evidenced by notes to be given by said mortgagor to said mortgagee and such notes shall be as fully secured hereby as if the same were specifically described and set forth herein, and in case of default in the payment thereof the mortgagee shall have all the powers, rights and privileges which, under the terms and provisions of the foregoing mortgage, it has in case of default in the payment of the note for sixty thousand (60,000) dollars described therein." Like provision was contained in the chattel mortgage and in the assignment of leases. Also the real estate mortgage contained this clause: "The mortgagor further agrees that, if default be made in the payment of any of the said notes, principal or coupons, or of the taxes as aforesaid, or if this mortgage is otherwise in default, then, and in that case, the said mortgagee, its successors or assigns, may without notice of its election, declare the principal note due and payable, and may proceed to collect the same with all accrued interest and taxes and any other sums secured hereby due up to the time of payment." A similar clause is found in the chattel mortgage and in the assignment of leases.

It is alleged that by reason of further advances made by plaintiff to defendant, defendant executed and delivered to

plaintiff the following notes: One dated June 10, 1929, for $19,000, payable in six months; one dated August 27, 1929, for $5,000, payable in three months; one dated September 28, 1929, for $10,000, payable in three months; one dated October 23, 1929, for $3,000, payable in sixty days; one dated October 29, 1929, for $3,500, payable in three months. For alleged failure to pay the first four of these notes when due and to pay the taxes, plaintiff declared the entire amount due, and commenced this action.

The answer of the defendant may be treated as a general denial. The intervener, Charles J. Dousman, upon leave of court being granted, filed an answer in intervention, in which he set forth that on February 13, 1930, the defendant company was adjudged a bankrupt and that thereafter he was appointed and duly qualified as trustee. His answer put in issue the material allegations of plaintiff's complaint and attacked the validity of the three instruments alleged to have been given as security, on grounds which will hereafter be discussed. It also contained an alleged counterclaim, but there was no evidence in support of it and, therefore, it requires no consideration here.

Issue was joined by reply, after which the cause proceeded to trial before the court sitting without a jury, resulting in findings of fact, conclusions of law, and a judgment of foreclosure as prayed for in the complaint. The intervener has appealed from the judgment.

The court found that pursuant to the laws of South Dakota, and in accordance with its by-laws, defendant company has transacted business by and through a board of directors and an executive committee composed of members of the board; that prior to the year 1919 the meetings of the stockholders of the corporation were regular and in strict accord with its articles of incorporation; that during the time of the business transactions referred to in the pleadings, Edward K. Whitmore was acting as president, Fred Engstrom as vice-president, and Al. Hansen as treasurer of defendant company; that since May 20, 1927, Thomas D. Cabot has acted as secretary of defendant;

that these officers have acted with the sanction and acquiescence of the stockholders; that during 1922 the stockholders and officers negotiated a loan from the plaintiff in the sum of $60,000, to be secured by a mortgage upon all of its property and an assignment of its oil and gas leases; that before obtaining the loan and before executing the mortgage and assignment, a special meeting of the stockholders was called upon notice stating its purpose, and no objections were made by any of the stockholders to the making of the loan and the execution of the mortgage and assignment; that thereupon, on September 15, 1923, a mortgage was made covering all of the real and personal property of the defendant, and an assignment of the leases was executed by the officers of the defendant company to secure the sum of $60,000 due five years from that date; that, to evidence the indebtedness, the defendant executed its promissory note in the sum of $60,000, dated September 15, 1923; that by the terms of that mortgage, provision was made for further advances in the sum of $10,000; that pursuant to that arrangement plaintiff advanced from time to time various sums of money to defendant, evidenced by short-time notes aggregating approximately $40,000 in addition to the $60,000; that the short-time notes were renewed from time to time and occasionally certain payments were made thereon; that the $60,000 note matured in September, 1928, and, being unpaid, the mortgages and assignment referred to in the pleadings were executed as renewal mortgages, and that plaintiff made further advances of money to defendant to pay the short-time notes and expense for drilling operations, resulting in the making of the short-time notes set out in the complaint; and that there is a balance due on the notes and mortgages amounting to $114,988.75. On these findings the decree complained of was entered.

There is no claim made by the intervener that there is no evidence to support the court's findings. His specific ground of complaint is that the mortgages and assignment are not valid "instruments" binding upon the creditors of the defendant. His claim is that he, as trustee, is in a better

position to attack the instruments than the defendant company. This contention is grounded upon section 75, U. S. C. A., Title 11, wherein it is provided that the trustee shall be "deemed vested with all the rights, remedies, and powers of a creditor holding a lien by legal or equitable proceedings thereon; and also, as to all property not in the custody of the bankruptcy court, shall be deemed vested with all the rights, remedies, and powers of a judgment creditor holding an execution duly returned unsatisfied."

That the intervener occupies a position different from that of the bankrupt by virtue of this statute there can be no doubt. (*Albert Pick & Co.* v. *Wilson,* (C. C. A.) 19 Fed. (2d) 18.) But this statute "may not be invoked to deprive a creditor of the bankrupt of equities existing in his favor at the time of the bankruptcy, and was not intended to limit the general rule that a trustee takes the bankrupt estate subject to all valid claims, liens and equities." (Collier on Bankruptcy, 13th ed., p. 1647; and see *Harper* v. *Dothan National Bank,* 223 Ala. 26, 134 South. 623.) Nor does the amended statute deprive a secured creditor of any remedy which the state law affords him. (*Robertson* v. *Roe,* 203 Iowa, 654, 213 N. W. 422; and see *Brown* v. *Timmons,* 79 Mont. 246, 256 Pac. 176, 57 A. L. R. 1122.)

The question before us, therefore, is: "Are the mortgages and assignment given as security valid?" On behalf of the creditors the intervener contends that the instruments are invalid because, as he asserts, they were given to hinder, delay, and defraud creditors of the defendant company. He contends that they are void because of section 8603, Revised Codes 1921, which provides: "Every transfer of property or charge thereon made, every obligation incurred, every judicial proceeding taken, and every act performed, with intent to delay or defraud any creditor or other person of his demands, is void against all creditors of the debtor, and their representatives or successors in interest, and against any person upon whom the estate of the

debtor devolves in trust for the benefit of others than the debtor.''

It should be noted that the instruments were executed more than four months before the filing of the petition in bankruptcy, and hence are not voidable on that ground under the federal Act (11 U. S. C. A., secs. 96 and 107).

It is proper for a debtor to prefer one creditor over another. Section 8601, Revised Codes 1921, expressly confers this power on the debtor. It provides: ''A debtor may pay one creditor in preference to another, or may give to one creditor security for the payment of his demand in preference to another.'' (See *Hale* v. *Belgrade Co., Ltd.,* 75 Mont. 99, 242 Pac. 425.)

Intervener's claim here is that the instruments are void as having been made fraudulently. His contention is that the instruments, when considered in connection with a certain sales agreement made between plaintiff and defendant in 1923 which was not placed of record, had the inevitable effect of working a fraud on other creditors of defendant company. The sales agreement was of the following tenor and effect: By its terms defendant appointed plaintiff its selling agent, and plaintiff agreed to use its best efforts to sell all of the carbon black produced by defendant. It was agreed that the price at which the carbon black should be sold should be controlled by the highest current market price obtainable for the grade of carbon black produced by defendant, and plaintiff agreed to make no sale at a lower price. It was stipulated that in the event the current market price falls to such a point that a satisfactory profit does not accrue to defendant, then the defendant, upon giving ten days' notice to the plaintiff, may discontinue shipments until the market improves to a satisfactory state. The agreement contained a clause authorizing defendant to sell its own product in the event that there were accumulations in its warehouses amounting to the production for a three months' period. It also provided that in the event that there were accumulations in the defendant's warehouses, plaintiff would

advance the needed funds not exceeding the value of the product so permitted to accumulate, to keep the plant of defendant in operation and pay the expenses which otherwise would be met by proceeds from the sales. Plaintiff also agreed to make a settlement with the defendant each month for all of the product shipped during the preceding month, within ten days after the receipt of the statement of shipments made by defendant. The agreement provided that the settlement be made by giving a sixty-day note dated the first of the current month, for the net amount received by plaintiff from all of the shipments, less seven and one-half per cent. commission. Plaintiff agreed to furnish to defendant a complete, detailed monthly statement of all transactions under the agreement, and to exhibit sufficient of the sales records to verify the correctness of the statements and the current market price obtaining at the time the sales were made. This agreement also provided that the plaintiff should loan to the defendant $60,000 at eight per cent. interest, this money to be paid from time to time as required by the defendant and to be secured by mortgage of all of the property of the defendant. It stipulated that this money was to be used in expanding the plant at Baker and other corporate purposes, and that the mortgage should be for a term of five years.

This agreement was read at a meeting of the board of directors of defendant company, held in Boston on June 19, 1923, and by unanimous vote of the directors was accepted and authority given that the proper papers be executed. Godfrey L. Cabot was then a member of the board of directors of defendant company and the president of plaintiff corporation. A meeting of the executive committee of defendant company was held in Boston on December 19, 1923, and the minutes of the meeting show the following:

"Papers covering the $60,000 mortgage between Godfrey L. Cabot, Inc., and Gas Products Co. were examined and found to be correct, with the exception that the signature of Mr. Fred Engstrom, as vice-president of the company, be added to the

assignment of leases, and his signature on all papers acknowledged before a notary public in the state of Kentucky.

"The contract for the sale of carbon black between Godfrey L. Cabot, Inc., and Gas Products Company was signed."

At a meeting of the stockholders of defendant company subsequently held in Boston, the action of the executive committee and of the board of directors, with reference to the loan of the $60,000 and the giving of a mortgage to secure the same, was ratified and confirmed. Thomas D. Cabot and Godfrey L. Cabot participated in this action as directors of defendant company, which board was composed of nine members.

At a meeting of the board of directors of defendant company held in Boston on February 25, 1929, it was unanimously voted to authorize the officers of defendant to execute the renewal note involved in this action, as well as the mortgages and assignment.

At a stockholders' meeting held at Boston on June 18, 1929, the action of the board, with reference to the mortgages and assignment of September 15, 1928, was ratified, confirmed and approved.

Intervener contends that the sales agreement placed the entire income of the defendant in the hands of plaintiff, to the detriment of other creditors. The evidence does not support this contention. Defendant under the agreement had the right to terminate it whenever plaintiff failed to faithfully discharge its duties thereunder. The agreement, considered in its entirety and in the light of the evidence showing how it was carried out, was beneficial to the defendant and its general creditors, in enabling defendant to have financial support for its operations even though the market for carbon black was unsatisfactory. There is no evidence to indicate that the plaintiff did not faithfully carry out its part of the contract to the entire satisfaction of the defendant and its other creditors, or to indicate that it operated to the detriment of the other creditors of defendant. On the contrary, the officers of the defendant company testified, in effect, that the contract was fully and

fairly complied with and that defendant received the proceeds from all of the sales of its carbon black, and that the sales contract operated to its benefit.

Intervener, though he denied in his answer filed on July 22, 1930, that "the defendant corporation is an insolvent corporation," contends that it was substantially insolvent for five years prior to the execution of the mortgages and assignment involved here, that plaintiff knew it, and that, in consequence, there was a fraudulent preference granted plaintiff over other creditors.

The evidence does not show the amount of debts owing by defendant, other than that due to plaintiff. In fact, we are not advised from the record whether other creditors of defendant, on whose behalf intervener complains, were such at the time the mortgages and assignment were made, or became such thereafter. In any event, the record discloses that the advances were actually made by plaintiff to defendant to enable defendant to continue operations and to enlarge its plant.

"While the cases are not entirely in accord on the subject, yet the weight of authority is to the proposition that a corporation, though in fact insolvent, that is, one whose debts in fact exceed its assets, may by mortgage secure or prefer a liability incurred by it or on its behalf. But the validity of the mortgage in such case will depend on its being made in good faith and to secure a bona fide indebtedness, while the corporation is a going concern, that is, while it is engaged in prosecuting its ordinary business, and that the purpose of the mortgage is to keep it upon its feet and to enable it to continue the prosecution of its business." (Thompson on Corporations, 3d ed., sec. 6196.) The rule, of course, is different where at the time of the transfer or mortgage the corporation suspends business operations. (*Furber* v. *Williams-Flower Co.,* 21 S. D. 228, 111 N. W. 548, 15 Ann. Cas. 1216, 8 L. R. A. (n. s.) 1259; sec. 6198, Thompson on Corporations, 3d ed.)

"But the fact that an insolvent corporation is prohibited from preferring creditors does not prevent such a corporation

from mortgaging its property to secure a present indebtedness. The cases concede that a corporation in active business may secure any present indebtedness by means of mortgage on its property; and it may provide for advances, both present and future, by securing the same by mortgage. Such a mortgage is not necessarily fraudulent although it may subsequently transpire that the corporation was, in fact, unable to pay all its debts at the time the mortgage was executed. Even an embarrassed corporation and one unable to pay its debts at maturity, is not necessarily insolvent so as to preclude it from preferring one creditor to another by means of a mortgage of its property." (Thompson on Corporations, 3d ed., sec. 6197.)

We cannot say from the record before us that the court erred in not holding that the instruments were fraudulent as to creditors.

The contention is also made that in South Dakota a corporation may not mortgage or sell all of its property, unless authorized so to do by a vote of the stockholders representing three-fourths of the outstanding stock. Chapter 118, Laws of South Dakota of 1909, provides: "At a meeting of the stockholders duly called for that purpose the stockholders representing three-fourths of the outstanding corporate stock may direct the sale or mortgaging of all of the corporate properties, and in such case the directors shall cause such conveyance or mortgage to be made accordingly." This is now made a part of section 8784, Compiled Laws of South Dakota of 1929. The supreme court of South Dakota has held that this statute does not limit the powers of the board of directors in the selling or mortgaging of the corporate property, but was intended to give the requisite number of stockholders power, if they so elected, to compel the directors to make a sale or to mortgage all of the corporate property. (*American National Bank* v. *Wheeler-Adams Auto Co.*, 31 S. D. 524, 141 N. W. 396.)

That a corporation, while a going concern, may mortgage all of its property is well settled. (14a C. J. 556.) The claim

that the mortgages and assignment are invalid because not directed by three-fourths of the stockholders cannot be sustained.

The further contention is made that the meetings held in Boston and the business transacted thereat amount to naught, because the laws of South Dakota require the articles of incorporation to provide where the principal business of the corporation shall be transacted and that stockholders' and directors' meetings must be held at its "office or principal place of business," and that pursuant thereto the articles of defendant provided that business offices shall be at Miles City, or Baker, Montana, or Minneapolis, Minnesota; that while the laws of South Dakota, sections 8766 and 8767, Compiled Laws of South Dakota of 1929, permit the articles to be amended in this respect, no amendment was ever made changing the place of business to Boston, where all the proceedings took place purporting to authorize the mortgages and assignment.

It is true that the evidence shows there was no amendment of the articles of incorporation changing the place of business to Boston. The evidence shows that a change in the place of business to Boston was made by an amendment of the by-laws only.

The district court properly held, under the circumstances shown, that the place where the meetings took place was immaterial. The business affairs of defendant were during its entire lifetime conducted by an executive committee composed of members of the board of directors, subject to the approval of the board of directors. This was with the acquiescence of the stockholders. They will not be heard to say now that the officers had no authority to transact business on behalf of the corporation. (*Mayger* v. *St. Louis M. & M. Co.*, 68 Mont. 492, 219 Pac. 1102, 1105; *Oscarson* v. *Grain Growers' Assn.*, 84 Mont. 521, 277 Pac. 14; *Uline Loan Co.* v. *Standard Oil Co.*, 45 S. D. 81, 185 N. W. 1012, 27 A. L. R. 585; *American Nat. Bank* v. *Wheeler-Adams Auto Co.*, supra.) The officers, if not elected at a proper meeting place, would at least be de facto

officers. (*Wright* v. *Lee*, 2 S. D. 596, 51 N. W. 706, 714; sec. 1212, Thompson on Corporations, 3d ed.)

Because of the fact that three of the directors of the defendant company—Godfrey L. Cabot, Thomas D. Cabot, and Edmund Billings—were also officers of, or otherwise interested in, plaintiff corporation, it is claimed the mortgages and assignment are invalid.

It should be stated that none of the officers of plaintiff were members of the executive committee of defendant, and at the time the original mortgage was made, in 1923, only one of the directors of defendant was connected with plaintiff corporation.

The board of directors of defendant consisted of nine members. At the meeting where the mortgages and assignment here involved were authorized, only six were present, including the three interested in plaintiff corporation. But their action was subsequently ratified, approved, and confirmed at a stockholders' meeting, and defendant and its stockholders have never questioned the validity of the mortgages or assignment. Were we to hold that the directors did not in fact authorize the instruments because of the place of holding the directors' meeting, and that the stockholders did not ratify the acts for the same reason, still the trustee could not now question them. The defendant accepted the benefits to it flowing from the transaction. It has continuously recognized the validity of the mortgages and assignment; it has listed them as valid in the bankruptcy schedules, and, hence, the trustee is precluded from asserting that the defendant has not ratified the entire transaction. (*Cory* v. *Hamilton National Bank,* (C. C. A.) 31 Fed. (2d) 379; and see *Prentiss Tool & Supply Co.* v. *Godchaux,* (C. C. A.) 66 Fed. 234.) "Estoppels good against the bankrupt, and not invalid against levying creditors had there been no bankruptcy, are good against the trustee." (Remington on Bankruptcy, sec. 1419.)

There is no evidence that any officer of plaintiff who was also a director of defendant dominated, controlled or in any way influenced the directors of the defendant company or

members of the executive committee, other than to give them advice, which was usually, though not always, acted upon. The fact that some of the directors of defendant were interested in the transactions resulting in the giving of the mortgages and assignment to plaintiff, by reason of their connection with plaintiff corporation, does not of itself vitiate the mortgages and assignment.

The rule is that "a mortgage executed by a corporation, under embarrassed circumstances, to enable it to continue its business, will be sustained, if the whole transaction be in good faith; and a corporation may also, in like manner, obligate itself to a stockholder or director." (*W. P. Noble Mercantile Co.* v. *Mount Pleasant etc. Co-op. Inst.*, 12 Utah, 213, 42 Pac. 869, 872; and see *Sanford Fork & Tool Co.* v. *Howe, Brown & Co.*, 157 U. S. 312, 15 Sup. Ct. Rep. 621, 39 L. Ed. 713; *Twin-Lick Oil Co.* v. *Marbury,* 91 U. S. 587, 23 L. Ed. 329; *Millsaps* v. *Chapman,* 76 Miss. 942, 26 South. 369, 71 Am. St. Rep. 547; *Wyoming Coal Sales Co.* v. *Smith-Pocahontas Coal Co.,* 105 W. Va. 610, 144 S. E. 410, 62 A. L. R. 740; *Jacobs* v. *Colcord,* 136 Okl. 158, 275 Pac. 649; *Cory* v. *Hamilton National Bank,* (C. C. A.) 31 Fed. (2d) 379; 7 R. C. L. 760, 761, note 7.)

The burden, of course, is placed upon a director to show that his dealings with the corporation have been fair and honest and that he has not gained an advantage thereby. (*Mayger* v. *St. Louis M. & M. Co.,* supra.) And "a mortgage given by a corporation to its directors for money actually advanced in good faith for the purpose of paying pressing debts is valid." (Collier on Bankruptcy, 13th ed., p. 1546; and see *In re Lake Chelan Land Co.,* (9th C. C. A.) 257 Fed. 497, 5 A. L. R. 557.)

The case of *Gordon Campbell Petroleum Co.* v. *Gordon Campbell-Kevin Syndicate,* 75 Mont. 261, 242 Pac. 540, is not controlling here. In that case the trustee clearly gained an advantage over the syndicate for which he acted as trustee, and there was no evidence of the ratification of the transaction by the syndicate, as here. The case of *Lyon* v. *Featherman,*

80 Mont. 504, 261 Pac. 268, was one wherein the directors of the corporation gained a decided advantage from their dealings with it. These cases do not depart from the rule announced in *Mayger* v. *St. Louis M. & M. Co.,* supra, where it was said: "But this does not carry the implication that one may not demand payment of an honest debt due him from a corporation of which he is a director."

Hence, if a corporation may give a valid mortgage to its own director, it certainly, under the same circumstances, may execute one to a corporation in which the director is interested as an officer or stockholder. That this is so seems to be well settled. In 14a C. J. 125, it is said: "The fact that the officers of one corporation are also officers of another does not make the corporations the same, nor the acts of one the acts of the other. Corporations controlled and managed by the same officers have a right to deal with each other. The mere fact that some * * * of the directors or contracting officers of two corporations are common to both does not make a contract between the two corporations absolutely void or incapable of ratification. It is voidable only; and it becomes binding and unassailable when ratified by each corporation either expressly or by acquiescence and lapse of time. Such contracts are valid at law, the reason being that in theory of law the contracting parties are the artificial persons and not the directors. Except in some jurisdictions where the rule obtains that the contract may be avoided by either corporation without regard to the question whether it is beneficial or detrimental, and no matter how open and seemingly fair it may be, the most that can be said against such contracts is that they will be subjected to a severe judicial scrutiny when properly challenged in a court of equity, and will be set aside for fraud or unfairness. On the other hand if, upon such scrutiny, it appears that there has been no abuse of the trust relations, but that the contract is fair, it will stand."

As above noted, the evidence warrants a finding that the contract between the two corporations, and the mortgages and assignment, were free from fraud and unfairness.

Intervener also contends that the real estate mortgage is invalid because it does not contain an affidavit of good faith as provided in Chapter 39, Laws 1927. That chapter provides: "All mortgages, deeds of trust, or assignments for the benefit of creditors, of both real and personal property, executed by a corporation, are governed by the law relating to mortgages, or deeds of trust of real property and must be recorded in the office of the County Clerk of every county where any part of said property is situated, and the same are valid, notwithstanding the possession of such property is retained by such corporation, but any such mortgages, deeds of trust, or assignments for the benefit of creditors must be accompanied by the affidavit of good faith required to accompany mortgages of personal property, which said affidavit may be made on behalf of any such corporation by the President, Secretary or Managing Agent thereof." This chapter does not apply to mortgages of real property not covering personal property. It applies only to mortgages of "both real and personal property" in one instrument. Here the real estate mortgage did not cover personal property as well as real estate. It was confined to real estate alone. The chattel mortgage covered the personal property, and it contained the requisite affidavit of good faith.

It is contended that if the mortgages and assignment are otherwise valid, they are not so because of the acceleration clause, which it is claimed the officers had no authority to incorporate therein. The authority given to the officers of defendant to execute the mortgages and assignment, as shown by the minutes, did not specify the terms of the mortgages or assignment, and particularly was silent as to the acceleration clause.

The rule is that a mortgage must be in accordance with, and contain such terms and conditions only as are within, the power given. (14a C. J. 462.) And unusual stipulations may not be inserted therein by corporate officers when not expressly authorized to do so. An acceleration clause was held to be an unusual provision in *Jesup* v. *Racine City Bank*, 14 Wis. 331.

But since the decision in that case such clauses have been so generally used in mortgages (41 C. J. 413) that we cannot say that at the time the mortgages and assignment involved here were executed, such a clause was an unusual one. It is now so universally used in mortgages that we hold that authority to execute a mortgage carries with it the implied authority to include in it an acceleration clause such as the one before us.

Intervener also contends that the mortgages and assignment were invalid as to creditors, because of the clause permitting additional advances without specifying when the notes given in payment therefor should mature, and particularly when short-term notes were given, as here, which, taken in conjunction with the acceleration clause, might bring the mortgage to a maturity long prior to the time of maturity of the note set out in the mortgage.

We fail to see any merit in this contention. The creditors were bound to take notice of the recorded mortgage, and were bound to know that under its terms, notes could be taken for further advances made by plaintiff to defendant; and, this being so, they must have known that some maturity date would have to be provided in the notes. They were not justified in presuming that they would be given the same maturity date as the principal note referred to in the mortgage. In any event, if the short-term notes had in fact been given the same maturity date as the principal note, we would have exactly the same situation before us now, so far as the creditors are concerned. It does not appear that they have suffered any prejudice by reason of the short-term notes.

We find no reason for disturbing the decree appealed from. It is accordingly affirmed.

MR. CHIEF JUSTICE CALLAWAY and ASSOCIATE JUSTICES MATTHEWS, STEWART and ANDERSON concur.

Rehearing denied March 16, 1933.